**BORG-WARNER ACCEPTANCE COR-PORATION, a body corporate**

v.

**Anthony J. ROSSI, Individually and trading as Rossi Refrigeration Sales and Service.**

**Civ. No. 71-174-B.**

United States District Court,
D. Maryland.

Dec. 13, 1972.

Mitchell Stevan and Sagner, Stevan & Harris, Baltimore, Md., for plaintiff.

William F. Mosner, Towson, Md., for defendant.

BLAIR, District Judge.

This action arises out of a series of transactions involving Borg-Warner Acceptance Corporation, Anthony J. Rossi, and the Cryocool International Corporation, a now bankrupt manufacturer of refrigeration systems. The relief sought in this court is fourfold: declaring that Borg-Warner has a valid security interest in certain refrigeration equipment in Rossi's possession; directing Rossi to permit Borg-Warner to peacefully enter onto his premises to take possession of that equipment; requiring Rossi to account to Bork-Warner for any proceeds resulting from the prior disposition of this equipment; and granting a monetary judgment against Rossi for $16,323, the unpaid balance of the purchase price, plus interest from December 6, 1969, the date after which the debt claimed was to bear interest. Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332, and the declaratory judgment statute, 28 U.S.C. §§ 2201–02.

The defendant, Anthony J. Rossi, for the past 30 years has worked in the field of refrigeration and for the last seven years has owned and operated his own business. In the summer of 1969, he became aware of a new system for refrigerating trucks that had been developed by a Texas Company, Cryocool International Corporation. Rossi journeyed to Texas to observe this equipment in operation and after seeing it he decided to become Cryocool's dealer in the Baltimore area.

On July 17, 1969, Rossi executed a dealer's agreement with Cryocool which

provided that he was to purchase certain equipment and would become the exclusive distributor of Cryocool equipment in the Baltimore area. The equipment was purchased at a total cost of $21,323 and Rossi made a $5,000 deposit. The refrigeration equipment was shipped by Cryocool as promised.

Prior to this delivery, however, Cryocool had arranged for Borg-Warner Acceptance Corporation to floor-plan its local distributors. To effectuate this financing agreement, Borg-Warner required each of Cryocool's dealers to execute a power of attorney which authorized either Cryocool or itself to sign any required documents on behalf of the dealer. Pursuant to this procedure, Borg-Warner received from Cryocool certain papers among which was a Finance Agreement and Power of Attorney purportedly executed by Rossi and a promissory note for $16,323 which appeared to be executed on Rossi's behalf pursuant to the power of attorney. On the strength of these instruments Borg-Warner advanced money to Cryocool. Rossi has made no payment to Borg-Warner or Cryocool on the balance due of $16,323.

To support its contentions that it is owed $16,323 by Rossi and that it has a security interest in certain refrigeration equipment in Rossi's possession, Borg-Warner has introduced four documents into evidence. They are: a finance agreement and power of attorney purportedly executed by Rossi in favor of both Borg-Warner and Cryocool International; a financing statement for the Cryocool equipment naming Borg-Warner as the secured party which appears to bear Rossi's signature; a trust receipt for the equipment in question which was signed for Rossi by a Borg-Warner assistant regional manager pursuant to the aforementioned power of attorney; and a promissory note made payable to Borg-Warner's order in the amount of $16,323 which was also signed for Rossi pursuant to the power of attorney.

Rossi apparently disputes Borg-Warner's claims on two grounds. The first is that because he had neither direct dealings with Borg-Warner nor knowledge of its claims he does not owe it any money. Rossi's second contention seems to be that even if a debt is owed to someone his obligation to pay it was negated by the failure of the Cryocool equipment to operate satisfactorily.

Borg-Warner counters these arguments by claiming its status to be that of a holder in due course. Thus it seeks to bring itself within the principle of the Uniform Commercial Code [1] which provides that a party who acquires a negotiable instrument for value, in good faith and without any notice of any defense takes that instrument free of the defenses of a party to that instrument with whom he has not dealt. U.C.C. §§ 3–302, 3–305.

To support this claim, Ronald Behm, Borg-Warner's regional manager in Texas, testified that his company had arranged with Cryocool to floor-plan all of that company's franchisees. Under that arrangement, Cryocool was to furnish Borg-Warner with certain information about its new dealers so that a decision on whether to finance them could be made. With respect to Rossi Refrigeration Sales and Service, Cryocool sent Borg-Warner a "new dealer information" form containing the details of Rossi's proposed purchases as well as a statement of Rossi's financial condition which appeared to have been prepared by Rossi. After receiving these documents, Borg-Warner reviewed Rossi's financial position and contacted some of his creditors as well as consulting his rating with Dun and Bradstreet. As a result of this investigation, Borg-Warner decided to extend credit to Rossi

1. As will become apparent in the course of this opinion, certain issues must be decided under Maryland law while others are controlled by the law of Texas. Since the relevant portions of the Uniform Commercial Code are identical in both states, citations will be to the Uniform Commercial Code generally.

and, after being notified that the equipment had been shipped, it paid $15,833.-31 to Cryocool in exchange for a promissory note made payable to the order of Borg-Warner in the amount of $16,323.

Behm also testified that prior to receiving the "new dealer information" form his company had no contact with Rossi or his business. He further testified that Borg-Warner had no proprietary interest in Cryocool International and that financing Cryocool dealers constituted approximately three-tenths of one percent of their total business. From this evidence, which was entirely uncontradicted and uncontroverted, this court finds as a fact that Borg-Warner took the promissory note for value, in good faith and without any notice of any defense of Rossi.

Rossi, however, denies liability relying on the provision of the code which states that a person is not "liable on an instrument unless his signature appears thereon." U.C.C. § 3–401. Both parties have stipulated that Rossi's secretary-daughter, Linda Tritapoe, signed the finance agreement and power of attorney and the financing statement in her father's name. Thus it is contended ·that Rossi is not bound by the contents of either document. Consequently the execution of the promissory note on Rossi's behalf by Cryocool's representative was unauthorized and did not create a negotiable instrument which would give Borg-Warner the status of a holder in due course. Rossi also contends that since his signature on the trust receipt was unauthorized the trust receipt would not render Borg-Warner a secured party able to enforce a security interest. *See* U.C.A. § 9–204.

Pointing to the provisions of the Uniform Commercial Code, §§ 3–403 and 3–404, Borg-Warner advances three theories under which Rossi will be responsible for the contents of the finance agreement and power of attorney, the financing statement, the promissory note and the trust receipt.

█ The first is that Linda Tritapoe, in her capacity as her father's secretary, continually signed checks and letters on his behalf so that the court should infer that she was Rossi's agent for the purpose of affixing his signature to all documents. A principal-agent relationship may arise in two ways. A person may actually authorize another to act on his behalf so that he is bound by that person's actions. This actual authority may be given to the agent either expressly by the statements or impliedly by the conduct of the principal. *See,* ABUC Trading & Sales Corp. v. Jennings, 151 Md. 392, 135 A. 166 (1926). In the absence of actual authority express or implied, a person may be bound by the acts of another if that person engages in a course of conduct which misleads a third party to his detriment into relying upon an apparent agency relationship. Reserve Insurance Co. v. Duckett, 240 Md. 591, 214 A.2d 754 (1965). Thus, if Linda Tritapoe had either the actual or apparent authority to affix her father's signature to the finance agreement and power of attorney, Rossi will be deemed to have signed them himself. U.C.C. § 3–403.

█ In Maryland, the burden of proving the existence of an agency relationship rests upon the party seeking to take advantage of it; in this case Borg-Warner.[2] P. Flanigan & Sons, Inc. v.

---

2. It is interesting to note that the plaintiff, in its case in chief, presented no evidence of agency or ratification. This could have been attempted by calling the defendant as an adverse witness. *See* Md. Code Ann., Art. 35, § 9 (1971). Instead, it sought through cross-examination of Rossi to provide the necessary evidence. Sensing this, the defendant's counsel strictly confined Rossi's testimony to those facts which indicated that the Cryocool system was defective. Apparently ·this tactic was used in hopes of preventing cross-examination as to those facts not covered in direct. The court, however, permitted the plaintiff to cross-examine Rossi with respect to agency, ratification and estoppel over strenuous objection by the defendant. The reason for this is simple. Section 9–206 of the Uniform Commercial Code provides that a party who as part of a

Childs, 251 Md. 646, 248 A.2d 473 (1968). No testimony was adduced to show that Rossi had ever empowered his daughter to sign his name to anything other than correspondence and business checks. Therefore, the court must conclude that Borg-Warner has failed to prove that Linda was given actual authority to sign the power of attorney. Likewise, Borg-Warner has failed to establish that Linda had the apparent authority to act in the way she did. As was previously stated, the doctrine of apparent authority requires that a third party rely to its detriment on what appears to be an agency relationship. In this case, it is arguable that Rossi, by allowing his daughter to affix his signature to correspondence and checks, has engaged in a type of conduct which could mislead a person into assuming an agency relationship existed. However, there is no evidence to show that Borg-Warner actually knew of this fact and relied upon it to its disadvantage. To the contrary, Borg-Warner's regional manager testified that it had no knowledge of either Rossi or his refrigeration company until after a number of documents including the power of attorney had been signed and forwarded in July 1969. Therefore, Borg-Warner has not shown that it is entitled to assert the doctrine of apparent authority.

■ The second theory of Borg-Warner is that Rossi had ratified Linda's conduct so that the signature on the power of attorney became legally his. U.C.C. § 3–404. To successfully avail itself of this doctrine, it is necessary for Borg-Warner to prove that Rossi had accepted the benefits of this agreement with full knowledge of its contents. Lissau v. Smith, 215 Md. 538, 138 A.2d 381 (1957). The evidence adduced fails to establish this essential ingredient.

Both sides have stipulated that Rossi received goods worth $21,323 and that he paid a deposit of $5,000. Furthermore, the dealer agreement which Rossi signed indicated that he would have 120 days to pay for the equipment purchased. From this fact, it is safe to conclude that a businessman with Rossi's experience must have realized that the refrigeration equipment was being financed. However, this knowledge is not inconsistent with Rossi's claim that he did not know that Borg-Warner was the financing company. See Clark v. Peoples Bank, 136 Md. 263, 110 A.2d 518 (1920). Borg-Warner has, therefore, failed to show that Rossi knowingly accepted the benefits of the disputed power of attorney, namely the floor-plan financing by Borg-Warner of the Cryocool equipment. Thus, the court concludes that the plaintiff has not met its burden of proving the elements of ratification and its argument must, accordingly, be rejected.

■■ The third theory relied upon by Borg-Warner is that Rossi is estopped from denying that the signature on the finance agreement and power of attorney or on the financing statement was made by him or his authorized representative, U.C.C. § 3–404, and that he is also estopped from asserting any other defense to Borg-Warner's claims that it is a secured party and a holder in due course. Simply stated, the concept of estoppel means that if one party, by his conduct, misleads another into relying to his detriment on a non-existent state of affairs, that party will be barred from taking a position inconsistent with the circumstances upon which the other party relied. See, e. g., Bean v. Steuart Petroleum Co., 244 Md. 459, 224 A.2d 295 (1966). Generally estoppel requires more than mere silence. Furst v. Carri-

---

single transaction signs both a finance agreement and a negotiable instrument agrees not to assert against the seller's assignee any claims or defenses that could be used against the seller. Thus, since Rossi by his testimony was claiming a defense of failure of consideration it was proper for

the plaintiff to inquire into whether Rossi was precluded from asserting such a defense because he was deemed to have signed both a finance agreement and a negotiable instrument by virtue of agency, ratification or estoppel.

co, 167 Md. 465, 175 A. 442 (1934). However, when the circumstances known to one person impose upon him the duty to speak in order to prevent another from sustaining injury the silence of that person will preclude him from asserting any defense to the claims of the injured party. First National Bank v. Wolfe, 140 Md. 479, 117 A. 898 (1922). Therefore, for Borg-Warner to prevail on the doctrine of estoppel it must establish two elements: first, that Rossi had a duty to notify it that he contested the claimed debt and security interest; and second, that this failure to communicate resulted in its sustaining an injury.

Borg-Warner admitted that it never explained its floor-planning arrangements directly to Rossi. However, it asserted that its normal business practices would give a Cryocool dealer sufficient notice of its claimed interest in the equipment. Borg-Warner's regional manager in Texas, Ronald Behm, testified that, after being notified that the floor-planned equipment had been shipped, it was the ordinary business practice of his company to mail a copy of the manufacturer's invoice and a copy of the Borg-Warner trust receipt to the purchasing dealer. Although no cover letter accompanied these documents, Behm testified that this procedure was intended to safeguard against the possibility of a manufacturer obtaining payment for goods that were not sent to the dealer.

Behm was unable to say from personal knowledge that the aforementioned papers were sent to Rossi. He did, however, testify that it was the ordinary business practice for his office to mail these documents to the dealer. Since this was an ordinary business practice in the office, there is a presumption that it was followed with respect to Borg-Warner's floor-planning Rossi's Cryocool equipment; and because, once mailed, a letter is presumed to have been received the presumption exists that Rossi did receive this correspondence from Borg-Warner. Mohr v. Universal C.I.T. Credit Corp., 216 Md. 197, 140 A. 2d 49 (1958). To rebut this presumption, Linda and the other member of Rossi's office staff testified that they did not recall that the invoice in question had ever been received. However, the office workers' testimony disclosed that not all mail was seen by either person and that it was possible that some mail was seen by neither. Furthermore, Rossi's testimony on this point was very contradictory. The court concludes that the defendant has not met his burden of rebutting the presumption that the documents were received.

Additionally, Rossi admitted that he had received in July and signed a document requesting that he procure a certificate of insurance on the Cryocool equipment naming Borg-Warner as the loss payee. He also acknowledged receiving from Borg-Warner a demand for payment as of November 5, 1969. Mr. Behm testified that the demand had been erroneously sent on November 5, 1969 rather than on December 5, 1969, the correct due date. The demand was for partial payment and clearly indicated that the balance due was being financed by Borg-Warner.

From the above evidence, this court finds as a fact that Rossi was in possession of four documents relating to Borg-Warner's involvement in the purchases made by Rossi from Cryocool. It is, therefore, necessary for this court to consider whether the contents of those documents imposed upon Rossi the duty to notify Borg-Warner that he questioned the validity of its claims.

The Cryocool invoice, sent to Rossi by Borg-Warner, clearly reflected the shipment of the equipment to Rossi Refrigeration Sales and Service. The description of the goods conformed to that which was contained in the dealer's agreement then existing between Rossi and Cryocool. Thus there can be no doubt that Rossi knew to which items the invoice referred. The invoice, however, stated that that equipment was sold to Borg-Warner and further indicated that the amount of $16,323 was owed to that company.

If this, of itself, was not sufficient to put any reasonable person on notice that Borg-Warner was claiming a substantial interest in the Cryocool equipment any deficiency was filled by the trust receipt which was mailed to Rossi by Borg-Warner. This document, which reflected the fact that it was signed on Rossi's behalf, notified him that Borg-Warner was, pursuant to a financing arrangement, claiming a security interest in the Cryocool equipment. As additional evidence that he knew that Borg-Warner was claiming a substantial interest in the equipment, Rossi testified that he received and signed a request that he procure insurance on that equipment which listed Borg-Warner as the loss payee and he acknowledged that he received from Borg-Warner a demand for payment on November 5, 1969 on account of the $16,323. Furthermore, there was evidence that Borg-Warner's representative came to Rossi's shop in December 1969 to check on the equipment being floor-planned.

From this evidence, the court concludes as a fact that Rossi knew that Borg-Warner was claiming a security interest in the Cryocool equipment in the amount of $16,323 pursuant to a floor-planning arrangement. Since Rossi knew of this claim, it was incumbent upon him to notify Borg-Warner that he disputed it. No timely notice was given. Rossi, when asked why he did not respond to the documents he admitted receiving, replied in effect that he attached no importance to them.

■ Having concluded that Rossi had a duty to notify Borg-Warner that he disputed its claimed interest, all that remains is for the court to determine if this failure to notify caused Borg-Warner to fail to take steps to protect itself from injury. Both sides have stipulated that an involuntary petition in bankruptcy was filed against Cryocool in Texas on February 10, 1970 and that Cryocool was adjudicated bankrupt on March 24, 1970. No timely and sufficient notice having been given by Rossi to Borg-Warner, it is apparent that Borg-Warner's reliance on Rossi was to its detriment when Cryocool went bankrupt. These facts are sufficient under Maryland law to estop Rossi from asserting any defense to Borg-Warner's claimed security interest in the Cryocool equipment and to estop him from asserting any defense to Borg-Warner's claim that it is a holder in due course of the note signed on Rossi's behalf. Mohr v. Universal C.I.T. Credit Corp., 216 Md. 197, 140 A.2d 49 (1958).

Alternatively, even if the court disregards the existence of the finance agreement and power of attorney, its conclusion that Borg-Warner is entitled to recover the unpaid balance of the Cryocool equipment's purchase price from Rossi would not be different. By the terms of the contract between Rossi and Cryocool, the law of Texas governs.

■ Under Texas law a debt may be orally assigned. See, White v. Downs, 40 Tex. 225 (1874); Rankin v. Kerrville Bus Co., 115 S.W.2d 997 (Tex.Civ.App. 1938). Relying on this principle of law, Borg-Warner contends that, at a minimum, it is a simple assignee [3] of Rossi's

---

3. Although neither the complaint nor the plaintiff's contentions as set forth in the pre-trial order expressly assert the theory of simple assignment of a contract debt, in the court's opinion such a contention arises by reasonable implication. Additionally, at the close of plaintiff's case, counsel for the plaintiff advised the court and the counsel for the defendant that plaintiff was asserting and relying upon assignment in addition to the expressly pleaded theories of recovery. Faced with this contention, the defendant elected to give testimony addressed to the defenses which he claimed to have against the seller and which under the law of assignment would preclude recovery by the plaintiff as assignee of the seller. Rule 15(b), F.R.Civ.P., provides in part:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any

debt to Cryocool and as such is entitled to be paid in full for the refrigeration equipment. Although direct evidence of an assignment of Rossi's debt by Cryocool was not adduced, the only reasonable inference to be drawn from the dealings between Cryocool and Borg-Warner leads the court to conclude that an assignment of the debt had occurred.

Borg-Warner's regional manager testified that his company had agreed with Cryocool to finance that company's franchisees. Under the arrangements for financing, Cryocool had the responsibility of furnishing Borg-Warner with the data which would enable it to decide whether to extend credit to the dealer. Furthermore, before Borg-Warner would advance money to Cryocool, it was necessary for Cryocool to forward to Borg-Warner an invoice showing that the equipment was sent and to forward a promissory note for the balance of the purchase owed by the dealer. Documentary evidence established that these procedures were carried out with respect to the Rossi Refrigeration Sales and Service. Borg-Warner introduced into evidence the "new dealer information" form and the financial statement upon which it based its decision to extend credit to Rossi. Furthermore, the copy of Borg-Warner's check made payable to Cryocool which was introduced into evidence reflects the fact that it was issued to pay the balance of the purchase price owed by Rossi and the promissory note signed for Rossi by Cryocool's representative clearly shows that Cryocool intended that Borg-Warner receive Rossi's payment when made. This court, therefore, finds as a fact that Cryocool assigned its right to be paid for the refrigeration system to Borg-Warner for valuable consideration.

■ An assignment, however, only vests in the assignee those rights which

are possessed by the assignor, Beavers v. Consolidated Oil Co., 31 S.W.2d 876 (Tex.Civ.App.1930). Thus, any defense that Rossi could assert against Cryocool may now be used to resist payment to Borg-Warner. Relying on this principle of law, Rossi testified at length as to the failure of the Cryocool equipment to perform satisfactorily so as to bring himself within the provisions of the Uniform Commercial Code allowing recision of a contract of sale when the goods delivered are defective.

■ Initially, it should be noted that Rossi's testimony does not convince the court that the equipment was in fact defective nor does it convince the court that any defects were not of a minor nature which could be remedied. However, assuming *arguendo* that the Cryocool equipment did not perform adequately it is clear that Rossi may not rely on this defect to justify his refusal to pay for the refrigeration equipment.

An examination of the applicable provisions of the Uniform Commercial Code discloses that after receiving goods, a buyer has a reasonable opportunity to inspect them for any defects. If, within this reasonable time, he discovers that the goods do not conform to the contract of sale or if any warranties, either express or implied, are breached the buyer has three alternatives. He may accept the goods with all of their defects; he may reject them entirely or he may accept any commercial unit or units and reject the rest. However, any rejection requires that the seller be notified and without such notification any rejection is ineffective. An acceptance of goods, on the other hand, occurs if the buyer notifies the seller that the goods are conforming or that he will retain them in spite of their defects or if the buyer fails to make an effective rejection. U. C.C. §§ 2–601 to 2–607.

party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.
Pursuant to this rule, the court concludes that the issue of assignment was fairly

raised, the defendants had timely notice, and the issue was properly before the court for determination.

Viewing Rossi's testimony against the backdrop of the Uniform Commercial Code leads the court to conclude that Rossi had accepted the Cryocool equipment and was, therefore, obligated to pay for it at the contract rate. U.C.C. § 2–607(1). At trial, it was stipulated that Rossi had received from Cryocool the equipment he had ordered at the price he had agreed to pay. Furthermore, Rossi acknowledged that he received the shipment from Cryocool on August 13, 1969.

Rossi testified that although he had a customer for the Cryocool equipment, he declined to sell it until he had an adequate opportunity to test its performance under actual conditions. For this purpose, he arranged with a Philadelphia company to evaluate the refrigeration system. The installation took place in September and Rossi claimed that within a short time he learned that the equipment's performance was not satisfactory. This trouble was reported to Cryocool which suggested several modifications that should be made to the refrigeration system and it also forwarded some substitute parts to correct the difficulties experienced.

According to Rossi, he incorporated the suggested changes into the system but he was still not satisfied with its performance. Therefore, at this time Rossi had a duty to notify Cryocool that he rejected the goods. No notice was given but instead, on October 8, 1969, Rossi purchased additional equipment valued at $8,000 for the purpose of increasing the geographical area in which he held an exclusive franchise.

Throughout his testimony, Rossi insisted that the refrigeration system never operated effectively. Other than the occasion when Cryocool sent replacement parts, there was no evidence that Rossi ever complained to Cryocool or that he ever attempted to return the equipment. To the contrary, in early November 1969, Rossi incorporated his distributorship as Cryocool of Maryland; on November 25, he was the host at a promotional party for the sale of Cryocool refrigeration systems and on December 22 he ordered more Cryocool business cards. Furthermore, Rossi admitted that he did not stop experimenting with the system until April 1970 after he found out that Cryocool had gone bankrupt. This conduct is not consistent with Rossi's claimed dissatisfaction with the Cryocool system.

The mere fact that Rossi failed to make an effective rejection is a sufficient basis for this court to find that an acceptance has occurred. U.C.C. § 2–606(1)(b). However, such a finding need not rest upon such a narrow ground. This court, after listening to all of the facts and circumstances disclosed by Rossi's testimony, is unable to imagine conduct more indicative of acceptance of the equipment. Thus, this court finds as a fact that the Cryocool equipment was accepted notwithstanding any defects which might have existed. Consequently, Rossi is obligated to pay to Borg-Warner the $16,323 which it owes as a result of the equipment purchases in question with interest from December 6, 1969.

The court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure are contained herein even if not expressly so characterized.

For the aforegoing reasons, the court holds that the plaintiff is entitled to the relief sought. Counsel will submit an order for judgment in accordance with this opinion.